UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANNY L. WILBER,

    Plaintiff,

v.                                              Case No. 21-C-521

JEFFREY MANLOVE, et al.,

    Defendants.

## DECISION AND ORDER

Plaintiff Danny L. Wilber, who is representing himself, is proceeding on Eighth Amendment deliberate indifference claims against Defendants Dr. Jeffrey Manlove, Mark Jensen, and Ann York based on their alleged failures to timely treat his nose injury and complaints of pain. On February 22, 2022, Defendants filed a motion for summary judgment. The Court will grant their motion and dismiss this case.

## BACKGROUND

At the relevant time, Wilber was a prisoner confined at Waupun Correctional Institution, where Dr. Manlove worked as a physician and Jensen and York worked as nurses. On April 21, 2018, Wilber reported to the health services unit after a metal pull-up bar snapped off its foundation and struck him in the nose. Nurse Vick (not a Defendant) examined Wilber and noted that he had a small laceration on the bridge of his nose and some blood coating the inside of his nose. She cleaned the laceration, gave him some Tylenol and an ice bag, and ordered a nursing follow-up in a couple days. Vick examined Wilber two days later as scheduled and noted there was no

significant swelling on the bridge of his nose or his right eye socket. Because she found no gross deformities, Dr. Manlove did not order an x-ray. Dkt. No. 22 at ¶¶2-5, 23-27; Dkt. No. 37 at 2.

About a week later, on April 30, 2018, Wilber submitted a health services request in which he wrote, "I'm having difficulty breathing out of my right nostril which may be due to a nose injury I sustained and I would like to be seen as soon as possible. Thank you." Jensen triaged the request and determined the request was not urgent or an emergency because Wilber did not complain of pain, signs of infection, or other emergency symptoms. Wilber was seen in health services a few days later, on May 3, 2018. Wilber complained that it was difficult to breathe through his right nostril. The nurse (not a Defendant) noted swelling and provided Wilber with nasal spray to help reduce the swelling. Wilber also had acetaminophen for pain. Dkt. No. 22 at ¶¶28-31.

Wilber had a follow-up appointment a week later, on May 10, 2018, with York. Wilber reported tenderness to the touch and said it still felt like air was not passing through his right nasal passage as it should. York noted some swelling, more on the right than left, some tenderness on the bridge of his nose, no gross deformity, and no shortness of breath. York determined his pain was related to his injury and would stop once the injury healed. She advised him to continue with the nasal spray and, because his nose was still swollen and he reported discomfort, she referred him for an appointment with an advanced care provider. Wilber did not request pain relievers. This was York's only appointment with Wilber prior to his nose surgery in February 2019. Dkt. No. 22 at ¶¶32-40.

A little more than a week later, on May 21, 2018, Wilber submitted another health services request in which he stated, "I am seeking medical attention. I sustained a nose injury and ever since I been having difficulty breathing out of my right nostril. Thank you." Jensen triaged the request and scheduled Wilber for a routine sick call appointment. He determined the request was

2

not urgent or an emergency because Wilber had been seen before and he did not complain of pain or signs of infection. Dr. Manlove saw Wilber a few days later, on May 25, 2018. Wilber reported that the swelling had gone down, but it still felt swollen and was hard to breathe through his right nostril. Dr. Manlove's examination revealed that Wilber's nose was tender, but the cartilage that separates the nostrils was straight and there was no obstruction or gross asymmetry. Dr. Manlove assessed Wilber with a nasal contusion and, based on the persistence of Wilber's symptoms, ordered an x-ray. Dkt. No. 22 at ¶¶41-46; Dkt. No. 37 at ¶5.

About two weeks later, on June 6, 2018, x-rays were performed on Wilber's nose. Dr. Manlove reviewed the results and saw Wilber that same day. The x-ray showed a fractured nasal bone. According to Dr. Manlove, a fractured nasal bone does not require urgent intervention because not all nasal fractures require surgery or specialist intervention, and it can take sixty to ninety days to determine whether the injury will resolve without surgery. The radiologist who read the x-ray could not definitively rule out additional injuries, so Dr. Manlove ordered a CT scan, which occurred six days later, on June 12, 2018. Dr. Manlove reviewed the scan about a week later, on June 18, 2018, and ruled out additional injuries. The scan showed a nasal bone fracture with slight leftward displacement. Dkt. No. 22 at ¶¶48-52, 56; Dkt. No. 37 at ¶¶6-7.

Dr. Manlove saw Wilber on June 21, 2018, and although Wilber continued to complain of difficulty breathing through his right nostril, he was not in any apparent distress. His vitals were normal, and his nose looked fairly symmetrical, although it was still mildly tender. Dr. Manlove noted no significant septal deviation. He diagnosed Wilber with a nasal fracture and chronic sinusitis, which is a long-lasting sinus inflammation and infection. Dr. Manlove prescribed an antibiotic for ten days and a recheck in one month. Dkt. No. 22 at ¶52.

A little more than three weeks later, on July 16, 2018, Wilber submitted a health services request stating, "On 6-21-18 was seen by Doctor in regards to x-ray & CT scan in nose results. The doctor acknowledged nose was broke but treated for a sinus infection. Pain and difficulty breathing still persist and I would like to be seen." Jensen triaged the request the next day, referred Wilber to see Dr. Manlove, and informed Wilber that he would see the doctor the following week. A few days later, Dr. Manlove examined Wilber and noted continued tenderness and congestion in the right nostril. He ordered a routine consultation with otolaryngology for further evaluation. Scheduling with an offsite specialist is largely dependent on the specialist's schedule and can take several weeks or months to schedule. Dkt. No. 22 at ¶¶53-57; Dkt. No. 37 at ¶¶10-11.

During this time, Wilber did not complain much of baseline pain, only tenderness. He had access to acetaminophen from the time of his injury until his surgery, and he made no requests for anti-inflammatory drugs such as ibuprofen. On December 6, 2018, Wilber had a consult with the otolaryngologist, who recommended surgery because of nasal obstruction and nasal deformity. Wilber underwent surgery on February 18, 2019. At the pre-operation appointment Dr. Manlove discussed pain killers with Wilber, and he declined them at that time. Wilber explains that he declined pain medication "because he was seeking treatment for the under[lying] medical issue (nasal obstruction and nasal deformity) not the symptoms of said injuries." Dkt. No. 22 at ¶¶58, 62-63; Dkt. No. 37 at ¶¶13-14, 96; Dkt. No. 34 at ¶65.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Johnson*

*v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)).  In response to a properly supported motion for summary judgment, the party opposing the motion must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted).  "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*  Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

Wilber asserts that Dr. Manlove, Jensen, and York were deliberately indifferent to his nose injury and pain.  He asserts that Jensen and York were dismissive of his complaints of pain and difficulty breathing and delayed referring him to an advanced care provider.  He also asserts that Dr. Manlove delayed ordering diagnostic tests and referring him to a specialist despite his persistent complaints.  According to Wilber, these delays resulted in his nose healing improperly, which necessitated surgery to repair the deformities.  Dkt. No. 37 at ¶¶35, 55.

Prison officials violate the Eighth Amendment when they act with deliberate indifference to a substantial risk of serious harm to an inmate's health. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  An "'inexplicable delay' in responding to an inmate's serious medical condition can reflect deliberate indifference.  That is especially so if that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citations omitted).  "The length of delay that violates the Eighth Amendment depends on

5

the severity of the condition and the ease of providing treatment . . . . However, a medical professional's treatment decisions will be afforded deference unless no minimally competent professional would have responded as such under the circumstances." *Hill v. Meyer*, No. 21-2884, 2022 WL 1078871, *3 (7th Cir. April 11, 2022) (citations omitted).

No jury could reasonably conclude that Jensen and York, who had limited contact with Wilber, were deliberately indifferent to his nose injury. Jensen's contact with Wilber was limited to triaging about six of the health service requests that Wilber submitted; he did not physically examine or treat Wilber. Dkt. No. 22 at ¶61; Dkt. No. 37 at ¶76. In each instance, Jensen responded to Wilber's request and, when requested, scheduled appointments with a health care provider or informed Wilber of upcoming appointments. *See* Dkt. No. 22 at ¶¶29-30, 41-42, 53-54. At no point did Wilber complain of any signs or symptoms of a medical emergency, and he remained under the consistent care of other health service unit staff. As such, no jury could reasonably conclude Jensen's responses to Wilber's requests demonstrated deliberate indifference to Wilber's condition. Wilber asserts that Jensen's written responses were "dismissive" and "hostile," *see* Dkt. No. 37 at ¶¶77-83, but unprofessional or rude responses on their own do not violate the Constitution. *See DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000). Jensen is entitled to summary judgment.

York's interactions with Wilber were even more limited. She saw him for the first and only time on May 10, 2018, a little more than two weeks after he injured his nose. York noted some swelling and tenderness, but no gross deformity or shortness of breath. She determined that any lingering discomfort would subside as his injury continued to heal, but because his symptoms persisted, she referred him to see Dr. Manlove. She did not prescribe pain relievers because Wilber did not request any and he continued to have access to acetaminophen. Wilber asserts that York's

6

plan of care was premature, *see* Dkt. No. 37 at ¶¶89-92, but he provides no evidence to support a conclusion that she had authority to do anything other than refer him to an advanced care provider, which is exactly what she did. *See* Dkt. No. 22 at ¶6 (explaining that nurses do not have authority to prescribe medication or order consults, referrals, or x-rays). Based on this record, no jury could reasonably conclude that York was deliberately indifferent to Wilber's nose injury. She is entitled to summary judgment.

Finally, Dr. Manlove is also entitled to summary judgment. He first saw Wilber about a month after his injury. Wilber reported that, although the swelling had gone down, his nose was still tender and swollen and breathing through his right nostril was restricted. Because Wilber's symptoms were not resolving, Dr. Manlove ordered an x-ray and, a couple of weeks later, a CT scan. Although Dr. Manlove diagnosed a nasal fracture, he noted that the nose looked fairly symmetrical and he detected no significant septal deviation. He then prescribed an antibiotic to address inflammation and set a follow-up appointment in a month. A month later, the tenderness and difficulty breathing through the right nostril persisted, so Dr. Manlove referred Wilber to a specialist who recommended surgery. At no time did Wilber request pain medication; in fact, he declined pain medication prior to surgery.

Wilber asserts that Dr. Manlove should have ordered diagnostic tests and referred him to a specialist sooner than he did. He asserts that the delay in doing so demonstrates Dr. Manlove's deliberate indifference to his injury and resulted in his nose healing improperly, which is why surgery was required. While it is true that an "inexplicable delay" in providing treatment can be evidence of deliberate indifference, Dr. Manlove provides an explanation for the delay. He explains that nasal fractures are a common nose injury and not always obvious. He states that swelling often prevents a thorough examination and re-examination is frequently necessary after

7

swelling subsides. He also explains that not all nasal fractures require surgery or specialist intervention and that it can take up to ninety days to determine if an injury will heal without surgical intervention.

Because Wilber's tenderness and restricted breathing persisted, Dr. Manlove ordered diagnostic tests about thirty days after Wilber was injured and prescribed an antibiotic to address the inflammation. When the symptoms persisted for another thirty days, Dr. Manlove referred Wilber to a specialist. Wilber presents no admissible evidence[1] from which a jury could reasonably conclude that Dr. Manlove's decision to wait sixty days to see if the injury would resolve without intervention departed significantly from accepted professional norms. *See Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (explaining that refusal to refer a prisoner to a specialist supports a claim of deliberate indifference only if that choice is blatantly inappropriate). Further, to the extent Dr. Manlove erred in deciding to wait as long as he did before ordering tests and making the referral, a mistaken belief in regards to medical treatment does not equate to deliberate indifference. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) ("[W]ithout more, a mistake in professional judgment cannot be deliberate indifference."); *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) ("[A] defendant's inadvertent error, negligence or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation.").

---

[1] In his declaration, Wilber asserts that Physician's Assistant Stephen Young, who treated Wilber after he was released from prison said that "medically and logically speaking the delay only exacerbated said injuries." Dkt. No. 37 at ¶38. He also states that Dr. Justin Miller, who also treated him after his release, told him that it was "unreasonable not to order diagnostic tests to assess the extent of face and nose injuries." *Id.* at ¶44. But Wilber's representation of what these doctors said to him is inadmissible hearsay and none of the medical records submitted by Wilber contain the quoted language.

8

Wilber points out that his injury did not resolve on its own, but he provides no evidence suggesting that Dr. Manlove knew that would be the case. Dr. Manlove's exam of Wilber's nose showed no gross deformities, only minimal swelling and tenderness, and relatively straight alignment. Nothing suggested that Wilber's nose was grievously injured or in need of emergency care. While Wilber would have preferred to have been referred to a specialist sooner, his disagreement with Dr. Manlove's plan of care does not support a conclusion that Dr. Manlove was deliberately indifferent to his injury. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).

Wilber also asserts that because of the delay, his nose healed improperly, which required that it be surgically repaired. But the medical records provided by Wilber do not support such a conclusion. According to the records submitted by Wilber, on February 15, 2022, Physician's Assistant Stephen Young noted that Wilber had a previous nasal fracture that required surgical repair. He went on to opine that, "unfortunately, this occurred during incarceration and was not dealt with appropriately at that time. This has resulted in chronic deformity, nasal obstruction, nasal congestion, and sinusitis." Dkt. No. 35-1 at 46. The records do not clarify whether it was the delay in getting surgery or the surgery itself (which was not performed by Dr. Manlove) that "was not dealt with appropriately at that time," and the Court will not speculate on that point. In any event, as the Court previously explained, even if Dr. Manlove's decision to wait and see if the injury would resolve without intervention was mistaken, negligence or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation. Dr. Manlove is entitled to summary judgment.

9

Case 1:21-cv-00521-WCG   Filed 07/05/22   Page 9 of 10   Document 38

# CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (Dkt. No. 20) is **GRANTED** and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Green Bay, Wisconsin this 5th day of July, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.